IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

KWASI A. GYAMFI,                    :
                                    :
            Plaintiff,              :    CIVIL ACTION
                                    :
     v.                             :
                                    :    NO. 09-cv-05672
WENDY'S INTERNATIONAL,              :
                                    :
            Defendant               :

## MEMORANDUM OF LAW

Joyner, J.                                    January 25, 2011

     Presently before the Court is Defendant's Motion for Summary
Judgment.  (ECF No. 25.)  For the following reasons, the Motion
shall be granted.

## I.  FACTUAL BACKGROUND

     Kwasi A. Gyamfi ("Plaintiff"), an African-American male of
Ghanaian descent, was hired on March 31, 2008, as an assistant
manager at Wendy's International ("Defendant").  As part of the
hiring process, Plaintiff had an initial interview with Stephanie
Tarkenton, a human resource representative.  Plaintiff was later
interviewed and hired by Didier Choisy, a district manager.  At
the time of his hiring, Plaintiff received and signed for a copy
of Defendant's Cash Control Policy, which outlined both a store
manager's responsibility for following and enforcing Defendant's
cash control procedures and the discipline that would result from
any failure to follow or enforce the procedures.  (ECF No. 25,
Ex. 7.)  Plaintiff also received and signed for several other

cash control related policies, which specified in more detail the procedures to be followed when handling cash and cash registers. (Id., Exs. 8, 9, 10.)

On May 26, 2008, after completing Defendant's management training program, Plaintiff was placed in Defendant's Broomall location as an assistant manager. At some point while at Broomall, Plaintiff overheard another assistant manager, Pamela Woods, use the phrase, "African motherfucker." Plaintiff claims to have complained about this incident to Choisy or Tarkenton.[1]

In addition, Plaintiff complained to Choisy about the practice of closing managers providing crew members rides to the 69th Street bus terminal due to the lack of late-night public transportation near the Broomall restaurant. Plaintiff did not want to use his personal vehicle to transport his fellow employees. Choisy and the Broomall managers and crew members allegedly pressured Plaintiff to provide rides, but Plaintiff refused. Ultimately, Choisy and Tarkenton decided to transfer Plaintiff to Defendant's Doylestown location, where staff members did not need rides. Plaintiff was satisfied with the location but did not appreciate being made to look like a non-team player.

Plaintiff began work at the Doylestown location on September 1, 2008. Although Plaintiff had not had any cash-handling issues

---

[1] Defendant notes that although it accepts Plaintiff's allegations as true for the purposes of the summary judgment motion, "after a thorough investigation, Wendy's disputes that Ms. Woods made the alleged comment." (Def.'s Mem. Supp. Mot. Summ. J. 7 n.4, ECF No. 25.)

at Broomall, during his time at Doylestown concerns were raised by the restaurant's general manager, Evan Kirstein, about Plaintiff's cash control practices. Kirstein reported to Choisy that Plaintiff was making mistakes when counting cash at the end of shifts and was taking too long to complete the daily cash reconciliation. Choisy met with Plaintiff several times to discuss Defendant's cash control policies and Plaintiff's responsibilities thereunder.

During his time in Doylestown, Plaintiff claims to have issued three disciplinary action notices to crew member Michael McClease, an African-American male, for cash control violations. At his deposition, Plaintiff testified that he submitted these notices to Kirstein, but that they were subsequently misplaced. As to McClease, the record reflects only one corrective action notice, which was issued by Anthony DiNardo for an $18.58 cash shortage in May 2008, prior to Plaintiff's arrival.[2] (ECF No. 25, Ex. 17.)

Between September 8, 2008, and September 14, 2008, while Plaintiff was the assistant manager on duty, there were three cash shortages totaling $223.69. On September 19, 2008, Choisy reviewed with Plaintiff a disciplinary notice — a Final Written Warning — that had been prepared concerning these cash-shortage

---

[2] Again, Defendant accepts Plaintiff's allegations as true, but notes that Plaintiff "has produced no evidence of these alleged write-ups to Mr. McClease. Wendy's asserts that Mr. McClease has only received one write up." (Def.'s Mem. Supp. Mot. Summ. J. 11 n.5, ECF No. 25.)

incidents and Plaintiff's failure to comply with Defendant's cash-control procedures. The notice stated that "[a]ny further violations of cash violation [sic] will result in immediate termination." (ECF No. 25, Ex. 14.) Plaintiff refused to sign the notice.

In response to this disciplinary action, Plaintiff sent an email to Tarkenton on September 27, 2008, explaining that he was "extremely unhappy with the unfair treatment, retaliation methods, [and] forced reassignment." (ECF No. 25, Ex. 15.) Plaintiff explained that the cash shortages were the fault of disruptive crew members who left work without permission. Plaintiff also accused Choisy of transferring Plaintiff "from restaurant to restaurant" in retaliation for Plaintiff's refusal to participate in the Broomall ride-share arrangement. He further complained that staff deceived him, scheduled him to work seven days in a row before an important exam, and failed to inform him of the fact that "the exam is 90 questions and not 80 questions." (Id.) He questioned whether his treatment was the result of his race: "Also, I have been given inaccurate assessments, and possibly experienced racial discrimination. Is it because I am an African American making capital?" (Id.)

On October 8, 2008, Tarkenton and Choisy held a meeting with Plaintiff to discuss his concerns. Despite the fact that Plaintiff had never given a fellow employee a ride to the bus

4

station, Plaintiff's concerns centered on the Broomall ride-share arrangement and Plaintiff's feeling that giving rides to crew members would have cut into his wages. Plaintiff also pointed to the cash control discipline as evidence of mistreatment. Choisy and Tarkenton discussed the cash control policy with Plaintiff to ensure that he understood his responsibilities, which he did. During the meeting, Plaintiff was again warned that further cash control violations would result in his termination.

On October 9, 2008, there was a cash shortage of $93 while Plaintiff was the manager on duty, which meant that during a thirty-day period there had been cash shortages of over $300 under Plaintiff's watch. Plaintiff spoke with Choisy about this incident and suggested that the shortage could be explained by employees stealing money.

On October 14, 2008, Plaintiff complained to Tarkenton by email that Doylestown crew member Nicholas Smith had placed his hand on Plaintiff's chest and twisted his nipple. The incident was investigated and Smith's employment was terminated on October 16, 2008.

At some point in October 2008, Plaintiff overheard a Doylestown crew member, Candice Morris, call another crew member a "stupid nigger." The comment was not directed at Plaintiff and Plaintiff never heard Morris utter any other racial slurs. No disciplinary action was taken against Morris, although Plaintiff

claims to have reported the incident to supervisors.[3]

At another point during Plaintiff's employment with Defendant, a crew member named Christopher Schloder was arrested outside of work and returned to work the next day. Plaintiff felt that Defendant could have handled the situation better.

The decision to terminate Plaintiff's employment was made by Tarkenton and Choisy with input from Dawn Roth, Defendant's human resource manager. On October 20, 2008, Plaintiff attended a meeting with Choisy and Tarkenton, who reviewed Plaintiff's termination notice with him. The notice detailed Plaintiff's failure to comply with Defendant's cash control procedures and his failure to fulfill his managerial responsibilities, resulting in a loss of $316.69 within a thirty-day time frame. (ECF No. 25, Ex. 20.) Plaintiff refused to sign the notice.

On December 31, 2009, Plaintiff filed a Complaint pro se, alleging discrimination, harassment, and retaliation by Defendant in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq.* ("Title VII"), and the Pennsylvania Human Relations Act, 43 P.S. § 951 *et seq.* ("PHRA"). Specifically, we understand Plaintiff's Complaint to assert disparate treatment national origin discrimination claims (Counts I, V); disparate treatment race discrimination claims (Counts II, VI); disparate

---

[3] Defendant notes that "Wendy's will accept Mr. Gyamfi's allegation as true. However, after a thorough investigation, Wendy's disputes that Ms. Morris made the alleged comment." (Def.'s Mem. Supp. Mot. Summ. J. 11 n.6, ECF No. 25.)

treatment sex discrimination claims (Counts III, VII);

retaliation claims (Count IV); and hostile work environment

claims (Count VIII).[4] Defendant filed a Motion for Summary

Judgment on October 7, 2010, to which Plaintiff filed a response

in opposition.  The matter is now ripe for disposition.

## II.  LEGAL STANDARD

When a party files for summary judgment, "[t]he judgment

sought should be rendered if the pleadings, the discovery and

disclosure materials on file, and any affidavits show that there

is no genuine issue as to any material fact and that the movant

is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(c)(2).  In making a summary judgment determination, all

inferences must be viewed in the light most favorable to the non-

moving party.  <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>,

475 U.S. 574, 587 (1986).  However, "[t]he party opposing summary

judgment 'may not rest upon the mere allegations or denials of

the . . . pleading'; its response, 'by affidavits or as otherwise

provided in this rule, must set forth specific facts showing that

there is a genuine issue for trial.'"  <u>Saldana v. Kmart Corp.</u>,

260 F.3d 228, 232 (3d Cir. 2001) (quoting Fed. R. Civ. P. 56(e)).

When the non-moving party is the plaintiff, he must "make a

---

[4] We have renumbered the counts of Plaintiff's Complaint so that they are numbered linearly in the order in which they are set forth in the Complaint.  We have also disregarded certain inconsistencies, such as the fact that Plaintiff's sex discrimination claim references only race discrimination.

showing sufficient to establish the existence of [every] element essential to [his] case." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "Conclusory statements [and] general denials . . . [are] insufficient to avoid summary judgment." Olympic Junior, Inc. v. David Crystal, Inc., 463 F.2d 1141, 1146 (3d Cir. 1972) (quoted in Chambers v. Sch. Dist. of Phila. Bd. of Educ., 587 F.3d 176, 197 (3d Cir. 2009)). While the pleadings of pro se litigants are held to less stringent standards than those drafted by lawyers, Haines v. Kerner, 404 U.S. 519, 520 (1972), a pro se plaintiff must still meet the above standard to survive a motion for summary judgment.

## III. ANALYSIS[5]

Plaintiff argues that Defendant's discriminatory and retaliatory animus caused him to be harassed, transferred, disciplined, and ultimately terminated. Plaintiff appears to argue further that Defendant used the alleged cash control violations to "cover up" its discriminatory and retaliatory actions. In other words, Plaintiff contends that Defendant's justification for disciplining Plaintiff was pretextual.

### A. Disparate Treatment

Title VII prohibits employers from discriminating against

---

[5] The analysis of claims made under Title VII and the PHRA is identical. Burgh v. Borough Council of the Borough of Montrose, 251 F.3d 465, 469 (3d Cir. 2001); Jones v. Sch. Dist. of Phila., 198 F.3d 403, 409 (3d Cir. 1999). Therefore, our discussion of this case under federal law applies equally to Plaintiff's state claims.

"any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). When evaluating a summary judgment motion in the context of a pretext disparate treatment claim, we employ the burden-shifting framework established by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973):

> Briefly summarized, the McDonnell Douglas analysis proceeds in three stages. First, the plaintiff must establish a prima facie case of discrimination. If the plaintiff succeeds in establishing a prima facie case, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the employee's rejection. Finally, should the defendant carry this burden, the plaintiff then must have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

Jones v. Sch. Dist. of Phila., 198 F.3d 403, 410 (3d Cir. 1999) (internal citations and quotation marks omitted).

To establish a prima facie case of discrimination, a plaintiff must show that: (1) he is a member of a protected class; (2) he was qualified for the position he sought to retain; (3) he suffered an adverse employment action; and (4) the action occurred under circumstances that could give rise to an inference of intentional discrimination.[6] Makky v. Chertoff, 541 F.3d 205, 214 (3d Cir. 2008). In order for a plaintiff to avoid summary

---

[6] For the purposes of Plaintiff's disparate treatment claims, Defendant does not dispute that Plaintiff satisfies the first two prongs of the prima facie test. Going forward with our analysis, therefore, we consider only the adverse employment action and inference of discrimination prongs.

judgment

> "when the defendant answers the plaintiff's prima facie
> case with legitimate, non-discriminatory reasons for its
> action, the plaintiff must point to some evidence, direct
> or circumstantial, from which a fact finder could
> reasonably either (1) disbelieve the employer's
> articulated legitimate reasons; or (2) believe that an
> invidious discriminatory reason was more likely than not
> a motivating or determinative cause of the employer's
> action."

Iadimarco v. Runyon, 190 F.3d 151, 165-66 (3d Cir. 1999) (quoting

Fuentes v. Perksie, 32 F.3d 759, 764 (3d Cir. 1994)) (emphasis

omitted). To discredit the employer's reasons, the plaintiff

must point to evidence demonstrating "such weaknesses,

implausibilities, inconsistencies, incoherencies, or

contradictions in the employer's proffered legitimate reasons for

its action that a reasonable factfinder could rationally find

them 'unworthy of credence,' and hence infer 'that the employer

did not act for [the asserted] non-discriminatory reasons.'" Id.

at 166 (quoting Fuentes, 32 F.3d at 765).

    1.    Race

We read Plaintiff's submissions as arguing that he suffered

the following incidents of racial discrimination: (1) being

unfairly administered an exam when he was scheduled to work

seven days in a row in advance of the exam and was informed that

the exam had ninety questions instead of eighty; (2) overhearing

two racial slurs used by co-workers; and (3) being disciplined

and terminated.[7]

            a.    Adverse Employment Action

    To the extent that Plaintiff argues that the unfair exam and
racial slurs are adverse employment actions, we must disagree.
In the context of Title VII discrimination claims, the Third
Circuit has defined an adverse employment action as "an action by
an employer that is 'serious and tangible enough to alter an
employee's compensation, terms, conditions, or privileges of
employment.'" Storey v. Burns Int'l Sec. Servs., 390 F.3d 760,
764 (3d Cir. 2004) (quoting Cardenas v. Massey, 269 F.3d 251, 263
(3d Cir. 2001)).  Of course, something less than a discharge can
be an adverse employment action.  Jones, 198 F.3d at 411-12.
Plaintiff cannot, however, establish an adverse employment action
on the basis of overhearing two racial slurs.

    We do not rule out the possibility that, under some
circumstances, the unfair administration of an important,
employment-related exam might be "serious and tangible enough" to
qualify as an adverse employment action.  In the instant case,
though, Plaintiff has alleged only that:

    Kwasi Adu Gyamfi was administered the Serv Safe exam
    unfairly by the Wendys [sic] Corporation.  Mr. Gyamfi had

_____
        [7] This is a very generous reading of Plaintiff's filings.  Plaintiff
never clearly alleges in his Complaint or briefs that he was disciplined and
terminated due to discriminatory animus based on race.  However, at various
points in the record — which we have no obligation to sift through on
Plaintiff's behalf, even considering his pro se status — Plaintiff speculates
that the disciplinary action taken against him was driven by racial bias.
Because this claim is easy to dispose of, we will consider it.

                              11

> taken the exam after working six days.  It is hilarious,
> because Mr. Gyamfi works five days a week every single
> week, he was at the company.  I find it hard to believe,
> that the defendant did not try to intentionally sabotage
> his ability to take the test.  The plaintiff believes he
> was administered the examination unfairly, because he is
> African American.  Once again, I had to work above the
> normal five day work week, which is approximately six or
> seven days in a row, and take the exam!

(Pl.'s Mem. Opp'n Def.'s Mot. Summ. J. 6, ECF No. 4.)  In addition,

Plaintiff accused Defendant of telling him that the exam consisted

of only eighty questions when it in fact had ninety.

Plaintiff's bare allegations that he was scheduled to work

one or two more days in advance of an exam of questionable

importance — Plaintiff does not point to any evidence showing how

the results of this exam would impact his career — and that he

was informed of an inaccurate number of exam questions are not

sufficient for this Court to conclude that the circumstances of

Plaintiff's test-taking constituted an adverse employment action.

### b.   Inference of Discrimination

Plaintiff also bases race discrimination claims on his

formal disciplinary notice and employment termination, which

unquestionably constitute adverse employment actions under

McDonnell Douglas.  However, summary judgment on these claims

must be entered in favor of Defendant because Plaintiff has not

established that the discipline or termination occurred under

circumstances giving rise to an inference of discrimination.

We reject outright any argument by Plaintiff that the two

racial slurs constitute evidence of Defendant's discriminatory animus from which we can infer that any disciplinary action taken against him was racially motivated. "Stray remarks by non-decisionmakers or by decisionmakers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of decision." Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 545 (3d Cir. 1992). It is undisputed that Candice Morris and Pamela Woods played no role in the process of deciding to discipline and terminate Plaintiff. Furthermore, Plaintiff has not provided any argument or evidence from which we could impute a discriminatory motive on Defendant's part based upon the derogatory statements made by Plaintiff's co-workers.

Plaintiff's only remaining "evidence" linking his discipline and termination with Defendant's racial animus is his speculative belief that he was being discriminated against. This is not sufficient to create the genuine issue of material fact necessary to survive a summary judgment motion. See Nelson v. DeVry, Inc., No. 07-4436, 2009 U.S. Dist. LEXIS 38161, at *19-20 (E.D. Pa. April 23, 2009) ("The plaintiff cannot rely on unsupported assertions, speculation, or conclusory allegations to avoid a motion for summary judgment."). Accordingly, we will grant Defendant's summary judgment motion on Plaintiff's race discrimination claims.

13

## 2. *National Origin*

Plaintiff also contends that his discipline and termination represent national origin discrimination. Plaintiff argues that Michael McClease, who Plaintiff asserts is not of Ghanaian origin, violated Defendant's cash control policy and was not disciplined as Plaintiff, a person of Ghanaian descent, was.

We assume for argument's sake that Defendant knew that Plaintiff was of Ghanaian descent and we further assume both that McClease is not Ghanaian and that Defendant was aware of that fact. In addition, we assume, despite the total lack of evidence in the record besides Plaintiff's own assertions, that McClease was in fact disciplined by Plaintiff three times for violating the cash control policy. Nevertheless, we conclude that Plaintiff cannot establish an inference of discrimination based upon allegedly different treatment of himself and McClease because McClease is not an appropriate comparator. McClease was a crew member who had a separate set of duties and responsibilities from Plaintiff, an assistant manager. The Final Written Warning issued to Plaintiff emphasized that "[o]ne of the management responsibilities of the daily operations is cash control" and that "[a]s an Assistant Manager with Wendy's [Plaintiff] violated policy by not properly banking crew members on and off of Wendy's registers." (ECF No. 25, Ex. 14.) Plaintiff's termination notice similarly focused upon Plaintiff's

14

failure to fulfill his managerial duties. McClease, as a crew member, had no such managerial responsibilities and, as such, was not similarly situated to Plaintiff.

As with his race discrimination claims, Plaintiff's only remaining evidence of Defendant's discriminatory animus is his speculative belief that "[i]t's a strong possibility" that he was disciplined due to his national origin. (Gyamfi Dep. 268, ECF No. 25, Ex. 1.) Again, this does not pass summary judgment muster. We will grant summary judgment in favor of Defendant on Plaintiff's national origin discrimination claims.

### 3. Sex Discrimination

Plaintiff asserts claims of sexual discrimination in his Complaint. However, throughout his filings, Plaintiff's only reference to sexual discrimination comes in the context of his sexual harassment and retaliation claims. Plaintiff never alleges or proffers any evidence that he was treated differently because of his sex. Nor does the record support such a claim. Plaintiff is unable, therefore, to establish a prima facie case of sex discrimination. Accordingly, summary judgment on these claims must be granted in Defendant's favor.

### 4. Pretext

Even assuming that Plaintiff established a prima facie case of discrimination on his disparate treatment claims, Plaintiff has not pointed to any evidence that undermines the legitimate,

15

non-discriminatory reason Defendant has articulated for disciplining and terminating him: that Plaintiff failed to comply with the cash control procedures he was required to follow as an assistant manager. Defendant documented Plaintiff's cash control violations, discussed the situation with Plaintiff, warned Plaintiff of the consequence of further violations, and, upon the subsequent occurrence of a violation, terminated Plaintiff's employment. Indeed, as Defendant points out, Plaintiff does not dispute that there were cash shortages while he was the manager on duty and that he received disciplinary action based on these cash shortages. (Gyamfi Dep. 138-58, ECF No. 25, Ex. 1.) Plaintiff contends, nevertheless, that this discipline was a cover-up of Defendant's discriminatory intentions. Plaintiff attempts to demonstrate the pretextual nature of Defendant's explanation by pointing again to McClease as a comparator and by arguing that

> [t]he defendant terminated plaintiff for cash losses.
> Though, they offered me two severance payments equating
> to approximately fourteen hundred dollars. It does not
> make any sense at all, that you would accuse the
> plaintiff of stealing money and then offer the plaintiff
> two severance payments.

(Pl.'s Mem. Opp'n Def.'s Mot. Summ. J. 6, ECF No. 4.) This is not sufficient evidence to discredit Defendant's asserted non-discriminatory reason for Plaintiff's discipline and termination. As we have already discussed, even assuming that McClease was disciplined by Plaintiff three times for cash control violations,

16

McClease is not an appropriate comparator for Plaintiff because he had different responsibilities under Defendant's cash control policies.  Furthermore, in light of the fact that Plaintiff was not terminated for stealing money, Plaintiff's second argument simply is not evidence of the kind of inconsistency and implausibility needed at the pretext stage.  Plaintiff has not met his burden under McDonnell Douglas of demonstrating pretext.

## B.  Retaliation

Title VII's anti-retaliation provision forbids an employer from "discriminat[ing] against any individual . . . because he has opposed any practice made" unlawful by Title VII or "made a charge, testified, assisted, or participated in any manner in" a Title VII investigation or proceeding.  42 U.S.C. § 2000e-3(a).  We analyze retaliation claims under the McDonnell Douglas framework.  Moore v. City of Philadelphia, 461 F.3d 331, 342 (3d Cir. 2006).

In order to establish a prima facie case of retaliation, a plaintiff must prove that: (1) he engaged in an activity protected by Title VII; (2) the employer took an adverse employment action against him; and (3) there was a causal connection between his participation in the protected activity and the adverse employment action.  Moore, 461 F.3d at 340-41 (citing Nelson v. Upsala Coll., 51 F.3d 383, 386 (3d Cir. 1995)).  It is undisputed that reporting sexual harassment qualifies as a

17

protected activity. Weston v. Pennsylvania, 251 F.3d 420, 430 (3d Cir. 2001), overruled in part on other grounds by Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53 (2006). To establish the second element of the prima facie case of retaliation, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Burlington N., 548 U.S. at 68 (internal quotation marks omitted). As to the third element, "'temporal proximity between the protected activity and the termination is [itself] sufficient to establish a causal link.'" Shellenberger v. Summit Bancorp, 318 F.3d 183, 189 (3d Cir. 2003) (quoting Woodson v. Scott Paper Co., 109 F.3d 913, 920 (3d Cir. 1997)). However, "'the timing of the alleged retaliatory action must be unusually suggestive of retaliatory motive before a causal link will be inferred.'" Id. (quoting Krouse v. Am. Sterilizer Co., 126 F.3d 494, 503 (3d Cir. 1997)) (internal quotation marks omitted).

Plaintiff's Complaint alleges that "Plaintiff was continually harassed for reporting the sexual harassment by Defendant's managers. Plaintiff was constantly relocated to different Wendy's locations, verbally insulted and eventually terminated as a result of reporting the harassment." (Compl. ¶ 39.)

18

The record reflects that the only protected activity in which Plaintiff participated was his reporting of the Nicholas Smith incident. To the extent that Plaintiff's retaliation claims are premised on the theory that Defendant transferred and harassed him in retaliation for his refusal to give rides to his Broomall co-workers, we must grant summary judgment in favor of Defendant. Plaintiff's opposition to the Broomall ride-share arrangement is not a protected activity under Title VII. Consequently, no action taken by Defendant in response to such opposition constitutes actionable retaliation. As the Third Circuit has noted, "'[m]any may suffer . . . harassment at work, but if the reason for that harassment is one that is not proscribed by Title VII, it follows that Title VII provides no relief.'" Moore, 461 F.3d at 342 (quoting Jensen v. Potter, 435 F.3d 444, 449 (3d Cir. 2006)).

Plaintiff reported the sexual harassment by Smith on October 14, 2008. On October 20, 2008, Plaintiff's employment was terminated. Employment termination clearly qualifies as an adverse employment action for Title VII retaliation purposes. As to the causal link between Plaintiff's report of sexual harassment and his termination, Plaintiff may rely upon the temporal proximity between the two actions to satisfy the third element of the prima facie case of retaliation.

As described above, however, Defendant has asserted a

19

legitimate, non-retaliatory reason for the termination — that is, Plaintiff's repeated cash control violations — and Plaintiff has failed to discredit this explanation. Although Plaintiff claims that he was disciplined as a consequence of his reporting of sexual harassment, the original disciplinary action occurred prior to the Nicholas Smith incident and prior to Plaintiff's reporting of it. Also prior to October 14, 2008, Plaintiff was warned both in writing and during his meeting with Choisy and Tarkenton that termination would result from further violations.

The temporal proximity between Plaintiff's report of sexual harassment and his termination is the only evidence linking the two events. This evidence was sufficient to establish a prima facie case of retaliation, but under the circumstances of the instant case more is required at the pretext stage. Here, the temporal proximity is not even unduly suggestive, as Plaintiff's termination was close in time both to the sexual harassment incident and to Plaintiff's fourth and final cash control violation. Without more, Plaintiff has failed to show that Defendant's reason for the discipline and termination was pretextual. We will grant summary judgment in Defendant's favor on Plaintiff's retaliation claims.

## C. Hostile Work Environment

A "discriminatorily hostile or abusive environment" violates Title VII's prohibition against discrimination with respect to an

20

individual's "terms, conditions, or privileges of employment."
Harris v. Forklift Sys., 510 U.S. 17, 21 (1993) (citing 42 U.S.C.
§ 2000e-2 (a)(1)). To establish a claim of hostile work
environment, a plaintiff must prove that: (1) he suffered
intentional discrimination because of his race or sex; (2) the
discrimination was severe or pervasive; (3) the discrimination
detrimentally affected him; (4) the discrimination would have
detrimentally affected a reasonable person of the same protected
class in his position; and (5) there is a basis for vicarious
liability. Jensen, 435 F.3d at 448, overruled in part on other
grounds by Burlington N., 548 U.S. 53 (2006); Caver v. City of
Trenton, 420 F.3d 243, 262 (3d Cir. 2005). "[W]hether an
environment is 'hostile' or 'abusive' can be determined only by
looking at all the circumstances." Harris, 510 U.S. at 23.

It is not clear from Plaintiff's briefs whether his hostile
work environment claims are premised upon racial or sexual
discrimination. At various points in his court filings,
Plaintiff has identified the following as constituting or
contributing to a hostile work environment:

(1) the Nicholas Smith incident;
(2) overhearing two racial slurs;
(3) Christopher Schloder being arrested;
(4) dealing with uncooperative and disruptive employees at
    the Doylestown restaurant;
(5) being pressured to participate in the ride-share
    program at the Broomall restaurant; and
(6) being belittled for his refusal to provide rides.

Plaintiff does not allege and there is no evidence showing that

21

Plaintiff's race or sex was in any way relevant to the arrest incident, the disruptive Doylestown employees, or the Broomall ride-share controversy. As such, Plaintiff cannot establish the first element of a hostile work environment claim based upon these events.

The remaining incidents, viewed cumulatively, also fail to establish a hostile work environment claim. The Supreme Court has instructed repeatedly that "Title VII . . . does not set forth a 'general civility code for the American workplace.'" Burlington N., 548 U.S. at 68 (quoting Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998)). Moreover, "comments referring to other individuals that were merely overheard by [the plaintiff] are the sorts of 'offhanded comments and isolated incidents' that the Supreme Court . . . cautioned should not be considered severe or pervasive enough to constitute a hostile work environment." Caver, 420 U.S. at 263 (quoting Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998)) (internal citation omitted).

Plaintiff admits that racially-offensive comments were only made "in his presence[] on two isolated occasions." (Pl.'s Mem. Opp'n Def.'s Mot. Summ. J. 2, ECF No. 34.) The comments were not spoken to Plaintiff nor were they made about him. There is simply no way for Plaintiff to establish a hostile work environment on the basis of these isolated incidents.

22

As for the Nicholas Smith incident, an example of co-worker harassment, Plaintiff cannot establish Defendant's vicarious liability. "[E]mployer liability for co-worker harassment exists only if the employer failed to provide a reasonable avenue for complaint or, alternatively, if the employer knew or should have known of the harassment and failed to take prompt and appropriate remedial action." Huston v. P&G Paper Prods. Corp., 568 F.3d 100, 110 (3d Cir. 2009). "An effective remedy — one that stops the harassment — is adequate per se." Jensen, 435 F.3d at 453 (citing Knabe v. Boury Corp., 114 F.3d 407, 411-12 n.8 (3d Cir. 1997)). "Accordingly, [an] employer cannot be liable under Title VII if its remedial action stopped the harassment." Huston, 568 F.3d at 110 (citing Knabe, 114 F.3d at 412 n.8)).

There is no question that Defendant's investigation and near-immediate termination of Smith's employment stopped Smith's harassment of Plaintiff. Defendant took prompt and appropriate remedial action immediately upon learning of the incident: Plaintiff informed human resources on October 14, 2008; an investigation ensued; and Smith's employment was terminated on October 16, 2008. Because Defendant's remedy ended the harassment, it was adequate per se.

Even viewing the evidence in the light most favorable to Plaintiff, no reasonable jury could find that Plaintiff established the elements of a hostile work environment claim.

Accordingly, we will grant summary judgment in favor of Defendant on these claims.

## IV. CONCLUSION

For the reasons stated above, Defendant's Motion for Summary Judgment is granted. Summary judgment will be entered in favor of Defendant and against Plaintiff.

An appropriate order will follow.